# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MOHAMED SAAD, | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | CIVIL CASE NO. 3:19-CV-00135 |
| v. | : | |
| | : | |
| ASML US, LLC | : | |
| | : | February 27, 2020 |
| | : | |
| **Defendant.** | : | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ASML US, LLC ("ASML" or "Defendant") respectfully moves this Court for an order granting summary judgment in its favor on Plaintiff Mohamed Saad's ("Saad" or "Plaintiff") Family Medical Leave Act ("FMLA") interference and FMLA retaliation claims. As more fully set forth below, summary judgment is warranted because:

(1)     ASML did not deny Saad any FMLA benefits to which he was entitled;

(2)     Saad's employment was terminated based on a long, well-documented history of performance problems that began before his alleged FMLA-protected activity; and

(3)     Saad cannot prove that ASML's legitimate, non-discriminatory reason for his discharge is pretextual; nor can he prove that his alleged exercise of FMLA rights was a "negative factor" in ASML's decision to end his employment.

The facts of the instant case are strikingly similar to those in *Hewett v. Triple Point Technology, Inc.*, 171 F.Supp.3d 10 (D. Conn. 2010) in which Chief Judge Underhill dismissed the plaintiff's FMLA interference and retaliation claims based on the same arguments made below. Accordingly, citations to *Hewett* appear throughout the instant Motion. Additionally, ASML's Motion for Summary Judgment is supported by the following Memorandum of Points and Authorities, ASML's Local Rule 56(a)1 Statement, and the Court's entire record herein.

*Oral Argument Requested*

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

I.    <u>FACTUAL BACKGROUND</u>

    A.    <u>The Parties.</u>

ASML is an innovation leader in the semiconductor industry.  (*See* Local Rule 56(a)1 Statement of Undisputed Material Facts ("SOF") at ¶ 1).  The company designs and manufactures lithography machines, which are used by companies like Intel and Samsung to produce microchips for smartphones and other devices.  (SOF ¶ 2).  ASML has plants throughout the United States, including one in Wilton, Connecticut.  (SOF ¶ 3).

Plaintiff Mohamed Saad is an experienced, well-qualified mechanical design engineer.  (SOF ¶ 4).  He has a bachelor's degree and a master's degree in mechanical engineering.  (SOF ¶ 5).  And he has a Ph.D. in mechanical engineering from the University of North Carolina, a well-known school for precision mechanics, which is what Saad was hired to do for ASML.  (SOF ¶ 6).  Saad worked for ASML as a Design Engineer 2 in Wilton, Connecticut reporting to Engineering Manager Chris Reed.  (SOF ¶ 7).  Chris Reed was the decisionmaker who hired Saad on January 4, 2016, and he was the decisionmaker who discharged Saad less than 20 months later, on August 24, 2017.  (SOF ¶ 8).

    B.    <u>Saad's Performance Problems.</u>

From the time he was hired, Saad underperformed in his role which caused delays and increased costs on Saad's projects.  (SOF ¶ 9).  For example, one of Saad's primary projects in 2016 was designing a fiber connection plate ("FCP") for the "Orion" project.  (SOF ¶ 10).  The FCP required a relatively simple design, and as an experienced design engineer, Saad should have been able to create a timely design for the FCP that was flawless by the time it reached the production floor.  (SOF ¶ 11).  In reality, Saad's FCP drawings had numerous errors that had to be fixed prior to production.  (SOF ¶ 12).  Basic flaws, such as threads being the wrong size so that bolts could not screw all the way into holes, riddled Saad's designs.  (SOF ¶ 13).  Then when ASML sent Saad's first FCPs to the production floor, numerous production issues were discovered that were attributed to design flaws built into the FCP by Saad.  (SOF ¶ 14).  Those

errors had to be fixed, which resulted in unplanned work that caused delays and increased expense to the project.  (SOF ¶ 15).  Chris Reed initially gave Saad the benefit of the doubt, and coached him throughout 2016 to help him improve his work quality.  (SOF ¶ 16).  But as 2016 wore on, Saad's consistently poor design quality, lack of attention to detail, lack of urgency (and resulting missed deadlines), and numerous errors that had to be caught by his coworkers became too problematic for ASML.  (SOF ¶ 16).  At the end of 2016, Reed rated Saad's 2016 work quality as "below expectations," and gave him an overall year-end performance rating of "partially meets expectations."  (SOF ¶ 17).  Reed included the following feedback in Saad's 2016 performance evaluation:

> 2016 cannot be considered a success for Mohamed. The year started rocky which can be partly attributed to the team development of the FCP. A concept was arrived upon, but the resulting quality can be attributed to the execution of the concept and as executor, responsibility of this result rests with Mohamed's performance.
>
> ***
>
> In line with other targets, high quality was not achieved, timeliness and documentation had issues, a presentation to the Group on Mohamed's ASML work did not happen. Performance cannot be considered meeting…expectations.
>
> ***
>
> Mohamed continues to have issues with sense of urgency and energy even after discussions on the topic. Being present physically and mentally are required for adequate performance.

(SOF ¶ 17).  For his part, Saad recognized there were areas in which he was struggling – he even rated himself "below the target" in one key area in his 2016 performance review – and he committed to work to improve his struggling performance.  (SOF ¶ 18).

Because he was rated "partially meets expectations" in his 2016 performance evaluation, ASML protocol required Saad to automatically be placed on a Performance Improvement Plan ("PIP") in 2017 to help rehabilitate his poor job performance.  (SOF ¶ 19).  Reed prepared Saad's PIP in the Spring of 2017, and delivered it to Saad on May 25, 2017.  (SOF ¶ 21).  The PIP identified three areas in which Saad needed to improve in order to keep his job: (1) attention to detail (eliminating errors and improving work quality); (2) being present (being engaged in his

work; demonstrating a sense of urgency and energy needed to meet commitments); and (3) meeting commitments (committing to and meeting deliverable due dates so project delays would not result). (SOF ¶ 22). The PIP included numerous examples of all three performance problems to help Saad recognize where improvement was needed. (SOF ¶ 22). Saad agrees that when he was placed on the PIP he needed to improve upon being present (attending meetings and sharing in meetings) and meeting commitments (hitting deadlines). (SOF ¶ 23). Saad also agrees he had lost his focus at work, which delayed his work product. (SOF ¶ 23).

ASML gave Saad 60 days to successfully complete his PIP. (SOF ¶ 24). To ensure Saad had more than enough time to demonstrate improvement, Reed only counted weekdays in calculating the 60-day deadline, which expired on or about August 15, 2017. (SOF ¶ 24). Throughout the PIP, Reed met with Saad every week one-on-one to evaluate his progress, identify action items to help him improve, and to record feedback and task status in a working version of the PIP they updated each week together. (SOF ¶ 25). Reed also met regularly with Saad's Team Lead (Matthew Urmaza) and Architect David Taub (with who Saad worked closely) to elicit feedback on Saad's job performance and his workload. (SOF ¶ 26).

Saad testified that the expectations of the PIP were clear to him, and he had all the tools and resources he needed to achieve success under the PIP. (SOF ¶ 27). Saad committed to improve his performance, and he even provided Reed with a written explanation of how he would improve his performance in the areas outlined in his PIP. (SOF ¶ 28). Saad agreed there was never any reason he could not be successful at ASML. (SOF ¶ 29). Saad also testified that he understood he could be fired if he did not demonstrate sufficient improvement under the PIP. (SOF ¶ 29).

      C.     **Saad's Absences and FMLA Eligibility.**

          1.     Saad received notice of his FMLA rights.

At the time Saad was hired, he went through ASML new-hire orientation, which included training on ASML's Human Resources policies, including its leave of absence policy which provides employees notice of their FMLA rights. (SOF ¶ 30). As an ASML employee, Saad had

24/7 access to ASML's HR policies through its secure intranet, so he was able to review his FMLA rights any time. (SOF ¶ 31). ASML's leave of absence policy explains all facets of FMLA eligibility and leave, including the following provisions which are pertinent to Saad's claims here:

> FMLA leaves are unpaid. However, an employee may use accrued sick and vacation for all unpaid family care and medical leaves.
>
> ***
>
> An employee must complete and submit a Request for Leave of Absence Form at least thirty (30) days, or as soon as possible and practical, in advance of taking an FMLA leave for foreseeable events … Even if oral notification has previously been given for an unforeseeable leave, an employee must still submit the Request for Leave of Absence Form … Failure to comply with the procedures outlined in his policy, may result in delay or denial of leave.

(SOF ¶ 32). The policy also provides for up to six (6) months of non-FMLA medical leave to employees who have exhausted their FMLA or who are not yet eligible for FMLA leave. (SOF ¶ 33).

In 2016, Saad ran his paid leave balances (sick and vacation) into the negative while allegedly caring for his wife who he claimed had been in and out of hospitals undergoing medical treatments for Crohn's disease. (SOF ¶ 34). On October 17, 2016, more than two months before he became FMLA-eligible, Saad emailed Reed because he needed additional time off to care for his wife who required more medical treatment for her condition. (SOF ¶ 35). Saad asked Reed:

> Is there anything in ASML [*sic*] HR system that can help to add hours to my vacation/sick balance? I have the medical records and discharge papers that support each incident.

(SOF ¶ 35). In response to Saad's email, Reed met with Saad in person on October 24, 2016 to discuss Saad's need for more time off. (SOF ¶ 36). Reed explained the FMLA benefits Saad would become eligible for in January 2017, and also encouraged Saad to talk to Human Resources ("HR") regarding other leave benefits that may be available to him before then. (SOF ¶ 37). That same day, Reed sent a follow-up email to Saad attaching the company's FMLA policy and encouraging Saad to contact HR:

> Mohamed, [a]s we discussed today FMLA is an avenue. The exact
> policy is here:
> https://my.asml.com/locations/us/uswide/US-
> HRO/Documents/Administrative%20Policies/103.pdf
> You need to have worked 12 months before taking advantage of it.
> For further details contact HR.

(SOF ¶ 38).  Saad admits he did not contact HR or click on the link to view ASML's leave

policy, but he acknowledges he could have done so if he wanted to.  (SOF ¶ 39).

> 2.    ASML did not deny Saad any benefits under the FMLA.

On January 4, 2017, twelve months after his hire date, Saad became eligible for FMLA

benefits.  29 U.S.C. § 2611(2)(A).  However, the first time Saad claims he engaged in FMLA-

protected activity was the third week of May 2017 when he allegedly notified ASML of his

wife's high-risk pregnancy.[1]  (SOF ¶ 40).  Even then, however, Saad did not ask the company for

any benefits under the FMLA.  (SOF ¶ 42).  According to Saad, he merely gave Reed "a heads-

up" that his wife may call him in the middle of a meeting, and he would have to run back home

to pick her up and take her to the hospital.  (SOF ¶ 43).  Saad never requested intermittent or

reduced-schedule leave from ASML – rather, Saad only asked the company to bless his time off

at the moment he took it.  (SOF ¶ 44).  And he always notified ASML of his need for time off

verbally – never in writing as ASML's policy requires.  (SOF ¶ 44).

In his lawsuit, Saad now claims that he needed intermittent FMLA leave ("a few days off

at a time") in 2017.  (SOF ¶ 45).  But Saad's own testimony belies his claim.  First, Saad testified

that he would only have needed FMLA leave if he had exhausted his paid vacation and sick time,

which ASML's leave policy allowed him to use before taking unpaid FMLA leave.  (SOF ¶ 46).

And, indeed, that is exactly what Saad did in 2016 when he ran his paid leave into a negative

balance, then reached out to inquire about other leave options available to him.  (SOF ¶ 47).

According to Saad, as long as he had paid time off, he would have used it to care for his wife

when needed; he would not have let it sit in the bank:

---

[1] Notably, the serious health condition Saad argues entitled him to FMLA in 2017 (his wife's high-risk pregnancy)
was *different* than the condition his wife had in 2016 (Crohn's Disease) which caused him to exhaust his paid leave,
then inquire about other leave options.  (SOF ¶ 41).

Q.  So if you had any sick or vacation time in the bank, you would
have used that to care for your wife if she needed to be cared for;
right?

A.  Yes.

Q.  You wouldn't just let –

MR. SABATINI: Object to form.

BY MR. NAYLOR:

Q.   You wouldn't just let sick or vacation time sit in the bank for
conservation purposes if your wife needed you to be home; right?

A.  No.

(SOF ¶ 48).[2]  And Saad does not dispute that, after becoming FMLA eligible on January 4, 2017,

he *always* had a net positive balance of paid leave which he could have used to care for his wife

when necessary.  (SOF ¶ 50).  In fact, a review of Saad's paystubs reflects that Saad's net paid

leave balance never dipped below 45.8 hours after he allegedly notified Reed of his wife's high-

risk pregnancy in late May 2017 – meaning Saad always had more than one week of paid leave

available to him to care for his wife if her condition required it.[3]  (SOF ¶ 51).  To that end, Saad

acknowledges that nobody at ASML ever told him he could not go home to care for his wife

when he needed to, and nobody stopped him from doing so.  (SOF ¶ 53).  Similarly, Saad

testified that during the time he was FMLA eligible, if his wife's condition ever required him to

leave work to be home with her, he always did so.  (SOF ¶ 54).

ASML is aware of only one instance in 2017 where Saad requested time off work to care

for his wife.  (SOF ¶ 55).  In that instance, Saad took August 21 to August 23, 2017 off work,

and used his available sick pay to cover his absence.  (SOF ¶ 55).  When Saad returned to work

on August 24, 2017, he informed the company that his wife had been in the hospital.  (SOF ¶

---

[2] Additionally, Saad had an economic incentive to use his paid time off before requesting unpaid FMLA because the
longest his family could have survived without his income was just two weeks.  (SOF ¶ 49).

[3] Saad's three final paychecks (ASML-SAAD.001362-1364), which are all dated September 1, 2017, reflect
negative sick and vacation balances because ASML paid Saad's accrued paid leave out at termination, but in fact
<u>over</u>paid him 22.64 sick hours and 4.62 vacation hours beyond what he was owed, due to a payroll error.  (SOF ¶
52).

56).  Additionally, at the time Saad returned to work on August 24, 2017 he had no plans to take any additional time off work.  (SOF ¶ 57).

Saad's own testimony is perhaps the best evidence of the fact that ASML did not interfere with his rights under the FMLA by denying him benefits:

> Q.  Going back to your interference claim, the claim that ASML interfered with your rights under the FMLA.
>
> What evidence do you have, as you sit here today, that ASML interfered with your FMLA rights?
>
> A.  Nothing.

(SOF ¶ 58).

### D.  The Decision to Terminate Saad's Employment.

Although the expectations in his PIP were clear, and he had the tools and resources needed to successfully complete his PIP, Saad failed to successfully complete the requirements of his PIP.  (SOF ¶ 59).

First, although Saad was physically present at work during 2017, he was not mentally engaged in his work as his PIP required him to be.  For instance, Saad admits he missed meetings during his PIP.  (SOF ¶ 60).  And Saad was caught sleeping on the job multiple times.  (SOF ¶ 61).  Reed caught Saad sleeping during a team meeting and had to nudge him awake, Urmaza caught Saad snoring in his cubicle on July 19, 2017 and again on August 10, 2017, and Saad himself admitted to sleeping on the job *four times* in June and July of 2017.  (SOF ¶ 61).  Despite his agreement that being present and engaged was an area in which he needed to improve, Saad failed to do so during his PIP.  (SOF ¶ 62).

Second, Saad failed to meet commitments as his PIP required him to do.  Meeting deadlines was part of his job, and Saad acknowledged that his failure to meet deadlines could delay the whole project and cost ASML a lot of money.  (SOF ¶ 63).  Reed mentored Saad on a weekly basis, helping him to develop a day-to-day plan for how he was going to get his work done by the commitment dates, but Saad's performance problems persisted and his pace of work was too slow.  (SOF ¶ 64).  As a result, Saad admits he turned in his work product late and "did

not hit deadlines during the PIP." (SOF ¶ 65). Despite his acknowledgement that meeting commitments was an area in which he needed to improve, Saad failed to do so during his PIP. (SOF ¶ 66).

Third, Saad failed to demonstrate sufficient attention to detail in his work. Saad acknowledges that ASML had the right to expect him to do his work with precision, free of needless errors. (SOF ¶ 67). But those errors persisted after Saad was put on the PIP. (SOF ¶ 68). So, in early July 2017, Reed decided to clear everything else from Saad's plate so he could focus his time exclusively on designing the objective test fixture, which was his most important project. (SOF ¶ 69). Reed did this so Saad could focus on one thing, without the distractions of other projects, and to ensure Saad had more than enough time to complete the objective test fixture on time and free of errors. (SOF ¶ 70). But even with this extra time, Saad's designs for the objective test fixture continued to suffer from defects and errors, which had to be caught by Saad's coworkers. (SOF ¶ 71). Saad would take his coworkers' feedback on the defects and errors back to his desk, then claim he had fixed them and solved all of the issues, only to present the design again with many of the same defects and often new defects that didn't exist in the prior version, thus creating extra work and causing delays in the project schedule. (SOF ¶ 72).

On or about August 15, 2017, the day Saad's PIP expired, Reed opened up Saad's 3D CAD model to view his design (which at that late date should have been error-free), and immediately discovered errors, including a critical mechanical interference. (SOF ¶ 73). The errors in Saad's design were so significant that the objective would not have mounted to the fixture – which was the entire purpose of the design. (SOF ¶ 74). David Taub marked up Saad's designs and sent them back to him in an email that explained the errors and circled them in Saad's design. (SOF ¶ 75). Saad acknowledged his primary error ("[s]omehow the angle shifted 5 degrees with the last update") and claimed he had fixed it. (SOF ¶ 76). But Taub, Urmaza and Reed found numerous other errors that made the design un-manufacturable. (SOF ¶ 77). Because Saad's design still had numerous critical errors, despite Reed's coaching and extra time ASML had given Saad by clearing his plate, Reed concluded that Saad had failed to meet the

"attention to detail" prong of his PIP – just like he failed to meet the "being present" and "meeting commitments" prongs as well.  (SOF ¶ 78).  Accordingly, on or about August 15, 2017, Reed made the decision to terminate Saad's employment for performance reasons; specifically, because he failed to meet the requirements of his PIP.  (SOF ¶ 79).

Fatally for his claims in this lawsuit, Saad agrees with ASML's legitimate, non-discriminatory reason for terminating his employment.  First, Saad acknowledges that his job performance did not improve, and actually got worse, while he was on the PIP:

> Q.  So your performance, according to you, your job performance actually declined in some respect from May 2017 until the end of your employment in August 2017?
>
> A.  Yes.

(SOF ¶ 80).  Second, Saad agrees that Chris Reed determined he had failed his PIP:

> Q.  Do you have a belief about who made the decision that you failed your PIP?
>
> A.  Yeah, I believe it's Chris Reed.
>
> Q.  Okay. What factors do you believe Chris Reed considered in determining that you had failed your PIP?
>
> A.  That I didn't meet what he want. That's what I think.
>
> Q.  So you think Chris Reed looked at the PIP itself and said "I don't think he did what I expected["] and –
>
> A. That's what I think.

(SOF ¶ 81).  Next, Saad acknowledges that his poor performance is the reason ASML fired him:

> Q. So the short answer to my question "Why do you believe ASML fired you?" is poor performance; right?
>
> A. Yes.

(SOF ¶ 82).  Saad even testified that in July 2017 he sensed he was failing the PIP and was at risk of losing his job, so he began applying for jobs at other companies.  (SOF ¶ 83).  And, finally, Saad agrees that Reed made the decision to terminate his employment one or two weeks

before his actual termination based, in part, on the misalignment identified in David Taub's August 15, 2017 email to Saad.  (SOF ¶ 84).

After Reed decided on or about August 15, 2017 to terminate Saad's employment based on his failed PIP, Reed set up a meeting with his boss Ken Bogursky, and HR representatives Cynthia Houston and Jennine Labriola, to discuss the logistics of the termination.  (SOF ¶ 85). They met on August 22, 2017 (the first date that was convenient for all participants), and it was decided that Reed and Houston would communicate the termination to Saad when he returned to work on August 24, 2017.  (SOF ¶ 86).  On August 24, 2017, Reed and Houston informed Saad that he was being discharged for failing to meet the goals of his PIP.  (SOF ¶ 87).  This lawsuit followed.

## II.   <u>ARGUMENT</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247– 48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986) (emphasis in original).  A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible."  *Gottlieb v. Cnty of Orange*, 84 F.3d 511, 518 (2d Cir. 1996).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie.  *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726–27 (2d Cir. 2010).

### A.   <u>Saad's FMLA Interference Claim Fails.</u>

To make a prima facie showing of FMLA interference, Saad must prove that: (1) he is an FMLA-eligible employee; (2) ASML is an employer, as defined in the FMLA; (3) he was

entitled to take FMLA leave; (4) he gave notice to ASML of his intention to take leave; and (5) he was denied FMLA benefits to which he was entitled. *Hewett v. Triple Point Tech., Inc.*, 171 F. Supp. 3d 10, 16 (D. Conn. 2016) (citing 29 U.S.C. § 2612(a)(1) and *Achille v. Chestnut Ridge Transp., Inc.*, 584 Fed. Appx. 20 (2d Cir. 2014)). Additionally, "[a]lthough it has not been formally incorporated into the required elements for an FMLA interference claim, the Second Circuit has suggested that a terminated plaintiff must also show that the employer considered the exercise of FMLA rights a negative factor in its decision to terminate [him]." *Id.* (quoting *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 176 (2d Cir. 2006) (observing that such evidence would be required for either a retaliation or interference claim to survive) (internal quotations omitted)). Saad cannot prove the last two elements of his FMLA interference claim. Additionally, Saad cannot prove that his alleged exercise of FMLA rights was a "negative factor" in ASML's decision to end his employment. Accordingly, his FMLA interference claim fails.

1.   Saad did not give notice of the need for FMLA leave.

Saad claims that, in the third week of May 2017 "plaintiff notified defendant, by and through a supervisory employee named Chris Reed, that he was missing time from work because he was caring for his wife who was going through a high risk pregnancy." (Compl. ¶ 12; SOF ¶ 40). Saad claims he needed intermittent leave ("a few days off at a time"). (SOF ¶ 45). But Saad admits he never requested intermittent or reduced-schedule leave – rather, he asked ASML to bless his time off at the moment he took it (which the company always did). (SOF ¶ 44). And he always notified ASML of his need for time off verbally – never in writing. (SOF ¶ 44).

"[A]n employee suffering from an ongoing 'serious health condition' may request intermittent or reduced-schedule leave, but the employee must request that accommodation *explicitly*," which Saad failed to do. *Hewett v. Triple Point Tech., Inc.*, 171 F.Supp.3d 10, 15 (D. Conn. 2016) (citing 29 U.S.C. § 2612(b)) (emphasis added). Additionally, Saad failed to comply with ASML's notice requirements for requesting FMLA leave. The law permits an employer to "require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave[.]" 29 C.F.R. § 825.302(d). "For example, an employer may

require that *written notice* set forth the reasons for the requested leave, the anticipated duration of the leave, and the anticipated start of the leave." *Id*. (emphasis added). ASML's FMLA policy requires employees to provide written notice in advance of taking an FMLA leave, and it makes clear that verbal notice is insufficient:

> An employee must complete and submit a Request for Leave of Absence Form at least thirty (30) days, or as soon as possible and practical, in advance of taking an FMLA leave for foreseeable events … Even if oral notification has previously been given for an unforeseeable leave, an employee must still submit the Request for Leave of Absence Form … Failure to comply with the procedures outlined in his policy, may result in delay or denial of leave.

(SOF ¶ 32). Saad knew he needed to request FMLA leave in writing because he had been notified of ASML's FMLA policy during orientation, and because Reed emailed him a copy of the policy on October 24, 2016. (SOF ¶¶ 30-31, 38). Thus, to the extent Saad now claims he needed FMLA leave, any delay or denial of that leave was justified because Saad ignored ASML's legitimate notice requirement. *See* 29 C.F.R. § 825.302(d) ("Where an employee does not comply with the employer's usual notice and procedural requirements, and no unusual circumstances justify the failure to comply, FMLA–protected leave may be delayed or denied.").

### 2. Saad was not denied FMLA benefits to which he was entitled.

In his Complaint, Saad claims that ASML interfered with his FMLA rights in three ways:[4] (i) failing to notify Saad of his FMLA rights; (ii) denying Saad the right to intermittent FMLA leave to care for his wife; and (iii) terminating Saad's employment.[5] (Compl. ¶ 30). For the reasons set forth below, none of these allegations supports Saad's FMLA interference claim.

---

[4] During his deposition, Saad narrowed his FMLA interference claim to the single allegation that "ASML interfered with [his] right under the FMLA by failing to inform [him] of the FMLA and the possibility that [he] could have benefits under the FMLA." (SOF ¶ 88). Giving Saad the benefit of the doubt, however, ASML will address the additional FMLA interference allegations set forth in his Complaint (at ¶ 30).

[5] Saad's Complaint also alleges that ASML interfered "by using the time plaintiff missed from work to care for his pregnant wife as a basis to criticize plaintiff's job performance" – but such criticism, without more, does not constitute evidence of interference. (Compl. ¶ 30(c)). "Other courts, however, have easily rejected the argument that asking an employee to 'spend more time at work' or to make up lost time from an FMLA-related absence, without more, is sufficient evidence of interference. *Hewett*, 171 F. Supp. 3d at 18 (citing *Di Giovanna v. Beth Israel Med. Ctr.*, 651 F.Supp.2d 193, 201 (S.D.N.Y. 2009) and *Weichman v. Chubb & Son*, 552 F.Supp.2d 271, 290 (D. Conn. 2008)).

(i)      ASML notified Saad of his FMLA rights.

According to Saad, if ASML had informed him of his FMLA rights on his first day of employment, he would have no claim against the company and would not have brought this lawsuit.  (SOF ¶ 89).  But, as set forth above, ASML *did* notify Saad of his FMLA rights at the outset of his employment during orientation, and by posting the policy on its intranet.  (SOF ¶¶ 30-31).  And Reed re-notified Saad of his FMLA rights again in October 2016 when Saad ran out of paid leave and inquired about other leave options.  (SOF ¶ 38).  Thus, according to Saad, this lawsuit should never have been filed.  (SOF ¶ 89).  But even assuming *arguendo* that ASML failed to notify Saad of his FMLA rights after receiving proper notice from Saad of his need for leave in 2017, ASML's failure "does not constitute the denial of a benefit necessary to state an interference claim unless the failure 'affected the employee's leave, benefits, or reinstatement.'" *Percoco v. Lowe's Home Centers, LLC*, 208 F. Supp. 3d 437, 448 (D. Conn. 2016) (quoting *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 162 (2d Cir. 1999)).  In other words, it is not enough for Saad to prove that ASML failed to notify him of his FMLA rights – he must also show "impairment of [his] rights and resulting prejudice," which he cannot do. *Hewett*, 171 F.Supp.3d at 18 (quoting *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 90, 122 S.Ct. 155 (2002)); *see also Fritz v. Eye Ctr.*, 2010 WL 3210863, at *3 (D. Conn. Aug. 12, 2010), *motion for relief from judgment granted on other grounds,* 2010 WL 4830000 (D. Conn. Nov. 17, 2010) (unpublished) (plaintiff must prove she was "somehow hindered from exercising her rights by defendant's failure to provide notice of the protections afforded under the Act[.]"); *Evarts v. Quinnipiac Univ.*, No. 3:15-CV-1509 (CSH), 2018 WL 4845743, at *11 (D. Conn. Oct. 4, 2018) (unpublished) ("Absent prejudice resulting from Quinnipiac's actions under the FMLA, Plaintiff is precluded from prevailing on his interference claim under the FMLA.").

(ii)      ASML did not deny Saad FMLA leave.

Contrary to his allegation in the Complaint (at ¶ 30), Saad was never denied any leave needed to care for his wife.  Saad testified that he would have needed FMLA leave only if he had exhausted his paid vacation and sick time, which ASML's leave policy allowed him to use

*before* taking unpaid FMLA leave.  (SOF ¶ 46).  As permitted by ASML's policy, Saad was clear that, as long as he had paid time off, he would have used it to care for his wife; he would not have let it sit in the bank.  (SOF ¶ 48).  And Saad does not dispute that, after becoming FMLA eligible on January 4, 2017, he always had a net positive balance of paid leave which he used to care for his wife when necessary.  (SOF ¶ 50).

Chief Judge Underhill addressed the same fact pattern in *Hewett*.  In that case TPT's leave policy (like ASML's here) "allowed Hewett to use her paid leave *before* taking unpaid leave under the FMLA, [so] Hewett did not need to use FMLA leave – she still had two sick days remaining at the time she was terminated and had not made any requests for more than two days of leave."  *Id*. at 17 (emphasis in original).  The fact that Hewett had paid leave, which she could use first (before using unpaid FMLA leave) led Judge Underhill to conclude what Hewett herself had to acknowledge – "TPT did not actually deny her any medical leave that she had requested." *Id*. at 18.

The same result should be reached here based on Saad's consistent balance of paid leave, and his admission that he would have used that paid leave first (as ASML policy allows) before using unpaid FMLA leave.  Moreover, (and in direct contradiction to the Complaint), Saad testified that nobody at ASML ever told him he could not go home to care for his wife when he needed to, and nobody stopped him from doing so.  (SOF ¶ 53).  Similarly, Saad testified that during the time he was FMLA eligible, if his wife's condition ever required him to leave work to be home with her, he always did so.  (SOF ¶ 54).  Based on his own admissions, no reasonable jury could find that Saad was denied leave to care for his wife in violation of the FMLA.

(iii)     Termination to avoid future leave is not a cognizable claim.

To the extent Saad plans to argue that his termination itself is a denial of his future use of FMLA benefits, the Second Circuit has squarely rejected that argument:

> That [the plaintiff's] termination necessarily prevented him from taking *future* FMLA leave—which he had not yet requested, and had no plans to request—does not create an issue of fact as to whether [the defendant] attempted 'to interfere with, restrain, or

deny the exercise of or the attempt to exercise, any right provided under' the FMLA. *See* 29 U.S.C. § 2615(a)(1).

*Thomsen v. Stantec, Inc.*, 483 Fed. Appx. 620, 622–23 (2d Cir. 2012), *cert. denied,* 568 U.S. 1122, 133 S.Ct. 931, 184 L.Ed.2d 724 (2013) (emphasis in original). And Saad testified that, at the time he was fired on August 24, 2017, he had no plans to take additional time off work. (SOF ¶ 57). This admission is fatal to his claim. *See Hewett*, 171 F. Supp. 3d at 18 (rejecting FMLA interference claim based, in part, on Hewett's termination where "Hewett had not yet requested time off, nor did she have any concrete plans to do so.").

3.   FMLA-protected activities were not a "negative factor" in Saad's termination.

Even if Saad could establish the fourth and fifth elements of his FMLA interference claim, he cannot prove ASML considered any FMLA-protected activity as a "negative factor" in its decision to end his employment. As discussed below in regard to his retaliation claim (Section II.B.2), Saad admits he was terminated for legitimate business reasons (specifically, poor performance), which negates his FMLA interference claim. *Hewett*, 171 F.Supp.3d at 18-19. In *Hewett* (which also involved a performance-based termination), Judge Underhill reached the same conclusion, holding that "Hewett cannot use her potential need for FMLA leave as a 'shield' against a legitimate termination." *Id*. at 19. *Hewett* also cited support for the Second Circuit's requirement that FMLA-protected activities must have been a "negative factor" in the decision to terminate in order for an FMLA interference claims to survive. *See e.g.,* 29 C.F.R. § 825.216(a) ("An employee has no greater right to reinstatement . . . than if the employee had been continuously employed during the FMLA leave period."); *Pearson v. Unification Theological Seminary*, 785 F.Supp.2d 141, 162 (S.D.N.Y. 2011) ("it is well-settled that an employer is not liable for 'interfering' with an employee's leave when the employee would have been terminated regardless of the leave."); *Geromanos v. Columbia Univ.,* 322 F.Supp.2d 420, 429 (S.D.N.Y. 2004) ("FMLA is not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA leave."). Here, Saad admits he was fired for poor performance at a time when he had no

plans to take additional FMLA leave.  Thus, he cannot use the potential need for future FMLA leave as a "shield" against his legitimate, performance-based termination.

**B.**      **Saad's FMLA Retaliation Claim Fails.**

Saad claims that ASML "retaliated against the plaintiff for the attempted exercise of his rights under the FMLA . . . by terminating plaintiff's employment."[6]  (Compl. ¶ 27).  "In order to make out a prima facie case, he must establish that: (1) he exercised rights protected under the FMLA; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent."  *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004).  "It is then the defendant's burden to proffer a non-retaliatory reason for the adverse employment action." *Karavish v. Ceridian Corp.*, No. 3:09-CV-935 JCH, 2011 WL 3924182, at *7 (D. Conn. Sept. 7, 2011) (Hall, J.) (unpublished).  "If it has done so, 'the plaintiff must then come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for retaliation.'"  *Id*. (quoting *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir. 2000)).

Saad's retaliation claim fails because he cannot prove the fourth element of his *prima facie* case; and he cannot he prove that ASML's legitimate, non-discriminatory reason for his discharge is pretextual.

1.      Saad cannot establish a *prima facie* retaliation claim.

ASML will assume *arguendo* that Saad can establish the first three elements of his *prima facie* claim for FMLA retaliation.  But Saad cannot prove that his discharge occurred under circumstances giving rise to an inference of retaliatory intent.  First, Saad has no evidence of retaliatory animus beyond the temporal proximity between his August 21 to 23, 2017 absence (during which he alleges his wife was hospitalized) and his August 24, 2017 termination.  And

---

[6] The Complaint also alleges that ASML retaliated against Saad "by using plaintiff's exercise or attempted exercise of righted [*sic*] protected under the FMLA as a negative factor when deciding to terminate his employment." (Compl. ¶ 27(b)).  However, ASML's alleged use of Saad's actual or attempted exercise of his FMLA rights as a "negative factor" in its decision to terminate his employment is not an independent adverse employment action; rather it is an element Saad must prove to prevail on his FMLA retaliation claim.  *Hewett*, 171 F.Supp.3d at 16 (citing *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 176 (2d Cir. 2006)).

although temporal proximity can provide a basis for a causal connection, if "timing is the *only* basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (emphasis added); *Sotomayor v. N.Y.C.*, 713 F.3d 163, 164 (2d Cir. 2013) (finding no prima facie case of FMLA retaliation where the plaintiff began receiving negative evaluations and letters in her file before her application for her first FMLA leave); *see also Elliot-Leach v. N.Y.C. Dep't. of Educ.*, 710 F. App'x 449, 452 (2d Cir. 2017) ("Because [Plaintiff] had been disciplined for work absences before she requested FMLA leave, and because she relies only on temporal proximity to suggest retaliatory intent, her retaliation claim fails.").

Here, the path to Saad's performance-based discharge was long and gradual, and it began at the outset of his employment in 2016 when his consistently poor job performance led to a year-end performance rating that <u>automatically</u> required Saad to be placed on a PIP in 2017. (SOF ¶¶ 9-19). Although Saad's PIP was not delivered until May 25, 2017, the fact that Saad would be required to successfully complete a PIP in 2017 to keep his job was predetermined as of the time his performance score was assigned at the end of 2016 – <u>before</u> he even became FMLA eligible. (SOF ¶ 20). The same deficiencies that plagued Saad's performance in 2016 continued to plague his performance throughout the PIP period and up to his termination, as documented in the PIP, emails, and notes of the weekly one-on-one meetings Saad had with Reed. (SOF ¶¶ 25-29, 59-78). And, the decision to discharge Saad was made on or about August 15, 2017 – six days <u>before</u> Saad took time off work to care for his wife, thus eliminating any causal connection with his alleged protected activity. (SOF ¶ 79); *see Lalanne v. Begin Managed Programs*, 346 F. App'x 666 (2d Cir. 2009) (unpublished) (affirming dismissal of retaliation claim where termination decision was made <u>before</u> plaintiff engaged in protected activity). Moreover, like the plaintiff in *Hewett*, Saad has not shown any evidence that ASML's evaluation of his performance in 2017 changed as a result of any FMLA-protected activity he claims to have engaged in. *See Hewett*, 171 F.Supp.3d at 20 (dismissing plaintiff's FMLA

retaliation claim because "she has not shown any evidence that the complaints or the performance evaluations changed as a result of her FMLA needs.").  As such, Saad cannot establish that his termination occurred under circumstances giving rise to an inference of retaliatory intent, and his FMLA retaliation claim should be dismissed.

> 2.    Saad cannot prove ASML's legitimate, nondiscriminatory reason is pretextual.

ASML terminated Saad's employment because Saad failed to meet the legitimate performance requirements of his PIP, despite Reed's weekly coaching and the extra time ASML gave Saad by clearing his workload of everything except the objective test fixture.  (SOF ¶¶ 25-29, 59-78).  Saad's poor work performance is unquestionably a legitimate, non-discriminatory reason justifying his termination.  *See Jain v. McGraw-Hill Cos., Inc.*, 506 Fed. Appx. 47, 48 (2d Cir. 2012) (plaintiff's poor work performance was a legitimate, non-discriminatory reason for terminating plaintiff's employment in an FMLA case); *Kelly v. Signet Star Re, LLC*, 971 F. Supp. 2d 237, 248 (D. Conn. 2013) ("an employer's dissatisfaction with the quality of an employee's work is a legitimate nondiscriminatory reason for adverse employment actions.") (internal quotations omitted).  Accordingly, the burden shifts back to Saad to demonstrate that ASML's legitimate, non-discriminatory reason is pretextual.  *Mancini v. Accredo Health Grp., Inc.*, 411 F. Supp. 3d 243, 256 (D. Conn. 2019).

At the pretext stage, Saad "must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action."  *Hewett*, 171 F.Supp.3d at 21 (quoting *Serby v. New York City Dep't of Educ.*, 526 Fed. Appx. 132, 135 (2d Cir. 2013) (internal quotations and citation omitted)).  Saad may prove pretext "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action."  *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013).  But Saad has no evidence

of any of these things.  And Saad cannot prove ASML's legitimate, non-discriminatory reason for terminating his employment was false because he <u>agrees</u> with it.

First, Saad acknowledges that his job performance did not improve, and actually got worse, while he was on the PIP.  (SOF ¶ 80).  Next, Saad knew he was failing the PIP and might lose his job, so he began applying for jobs at other companies.  (SOF ¶ 80, 82-83).  Third, Saad agrees Reed made the decision to end his employment one or two weeks before his actual termination due to the errors in Saad's designs.  (SOF ¶ 84).  And, finally, Saad testified unequivocally that his own poor job performance is the reason ASML fired him:

> Q. So the short answer to my question "Why do you believe ASML fired you?" is poor performance; right?
>
> A. Yes.

(SOF ¶ 82).  As a result of these admissions, Saad is precluded disputing his poor job performance.

Yet even if Saad were to dispute ASML's assessment of his performance, doing so is insufficient to prove pretext.  *See Jarnutowski v. Pratt & Whitney*, 103 F. Supp. 3d 225, 239 (D. Conn. 2015) ("It is well-settled that a plaintiff may disagree with his employer about the assessments of his performance, but that does not, in turn, raise a triable issue of fact with respect to pretext."); *see also Ricks v. Conde Nast Publ'ns, Inc.*, 6 Fed. App'x. 74, 78 (2d Cir. 2001) (unpublished) ("an employee's disagreement with her employer's evaluation of her performance is insufficient to establish discriminatory intent").  "Put differently, a plaintiff's subjective belief that he was a better performer than his supervisor believed him to be is insufficient to prove pretext." *Jarnutowski*, 103 F. Supp. 3d at 239 (internal quotations omitted).  "Additionally, 'it is not the function of a fact-finder to second-guess business decisions' regarding what constitutes satisfactory work performance."  *Soderberg v. Gunther Int'l, Inc.*, 124 F. App'x 30, 32 (2d Cir. 2005) (unpublished) (quoting *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988)).

Because Saad has no evidence of pretext, he is expected to highlight the temporary proximity between his August 21 to 23, 2017 absence (during which time he cared for his wife)

and his termination on August 24, 2017.  However, "evidence of 'temporal proximity between protected activity and an adverse employment action, alone, is insufficient to establish pretext.'" *Hewett*, 171 F.Supp.3d at 21 (quoting *Davies v. New York City Dep't of Educ.*, 563 Fed. Appx. 818, 820–21 (2d Cir. 2014); *see also El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) ("temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext.").  Additionally, although Saad was discharged on August 24, 2017 (after his absence), the decision to discharge him was made nearly a week <u>before</u> Saad's absence began, therefore eliminating any causation between the two.  *See Lalanne*, *supra*.  Because Saad cannot meet his burden of proving that ASML's legitimate, non-discriminatory reason was both false *and* that retaliation was likely the real reason for his termination, his FMLA retaliation claim necessarily fails.  *Hewett*, 171 F.Supp.3d at 21.

## III.   <u>CONCLUSION</u>

For the reasons set forth above, there is no genuine dispute as to any material fact, and ASML is entitled to judgment as a matter of law on Saad's FMLA interference and FMLA retaliation claims.  ASML respectfully requests an order from the Court entering judgment in its favor, and dismissing this lawsuit with prejudice.

RESPECTFULLY SUBMITTED this 27th day of February, 2020.

By     */s/  Benjamin J. Naylor*
Benjamin J. Naylor (ct30702)
**BURNSBARTON PLC**
2201 E. Camelback Rd., Suite 360
Phoenix, AZ  85016
T: (602) 753-4500
F: (602) 428-7012
ben@burnsbarton.com
Attorney for Defendant

## <u>CERTIFICATE OF SERVICE & NOTICE OF ELECTRONIC FILING</u>

I hereby certify that on the 27th day of February 2020, I electronically transmitted the foregoing document to the Clerk's office using the ECF System for filing and transmittal of a Notice of Electronic filing to the following ECF registrant:

James V. Sabatini, Esq.                    ([jsabatini@sabatinilaw.com](mailto:jsabatini@sabatinilaw.com))


<u>/s/ *Carolyn Galbreath*            </u>
An employee of BURNSBARTON PLC