UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MOHAMED SAAD, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL CASE NO. 3:19-CV-00135 |
| v. | : | |
| | : | |
| ASML US, LLC | : | |
| | : | February 27, 2020 |
| | : | |
| Defendant. | : | |

## LOCAL RULE 56(A)1 STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Fed. R. Civ. P. 56, and Local Rule 56(a), Defendant ASML US, LLC ("ASML") submits the following statement of undisputed material facts:

1. ASML is an innovation leader in the semiconductor industry. *See* Declaration of Chris Reed, attached hereto as **Exhibit A** ("**Reed Decl**.") at ¶ 5.

2. The company designs and manufactures lithography machines, which are used by companies like Intel and Samsung to produce microchips for smartphones and other devices. Reed Decl. at ¶ 6.

3. ASML has plants throughout the United States, including one in Wilton, Connecticut. Reed Decl. at ¶ 7.

4. Plaintiff Mohamed Saad is an experienced, well-qualified mechanical design engineer. *See* December 17, 2019 Deposition of Chris Reed, relevant excerpts attached hereto as **Exhibit B** ("**Reed Depo**."), at pp. 26:15-27:7; *see also* Exhibit 1 to Reed Decl..

5. He has a bachelor's degree and a master's degree in mechanical engineering. Reed Decl. at ¶ 9.

6. And he has a Ph.D. in mechanical engineering from the University of North Carolina, a well-known school for precision mechanics, which is what Saad was hired to do for ASML. Reed Depo., at pp. 26:15-27:7; Exh. 1 to Reed Decl. at ASML-SAAD.00002.

7. Saad worked for ASML as a Design Engineer 2 in Wilton, Connecticut reporting to Engineering Manager Chris Reed.  *See* August 13, 2019 Deposition of Mohamed Saad, relevant excerpts attached hereto as **Exhibit C** ("**Saad Depo**."), at pp. 65:25-66:11, 82:15-16.

8. Chris Reed was the decisionmaker who hired Saad on January 4, 2016, and he was the decisionmaker who discharged Saad less than 20 months later, on August 24, 2017.  Reed Depo., at pp. 25:2-8, 99:5-16; *see also* Complaint [Dkt. 1] ("Compl.") at ¶¶ 8, 11.

9. From the time he was hired, Saad underperformed in his role which caused delays and increased costs on Saad's projects.  *See generally* Exhs. 2-3 to Reed Decl.; Reed Depo., at pp. 51:24-53:2, 54:15-55:8, 63:13-64:4; Saad Depo., at pp. 110:22-111:9, 200:25-203:22.

10. For example, one of Saad's primary projects in 2016 was designing a fiber connection plate ("FCP") for the "Orion" project.  Reed Depo., at p. 121:18-25.

11. The FCP required a relatively simple design, and as an experienced design engineer, Saad should have been able to create a timely design for the FCP that was flawless by the time it reached the production floor.  Reed Decl. at ¶ 17; Reed Depo., pp. 42:3-22, 54:15-55:8.

12. In reality, Saad's FCP drawings had numerous errors that had to be fixed prior to production.  Exh. 2 to Reed Decl. at ASML-SAAD.00038; Reed Depo., at pp. 42:3-22, 51:24-53:2, 54:15-55:8, 63:13-64:4.

13. Basic flaws, such as threads being the wrong size so that bolts could not screw all the way into holes, riddled Saad's designs.  Exh. 2 to Reed Decl. at ASML-SAAD.00038; Reed Depo., pp. 61:9-62:12.

14. Then when ASML sent Saad's first FCPs to the production floor, numerous production issues were discovered that were attributed to design flaws built into the FCP by Saad.  Reed Depo., at pp. 54:15-55:8.

15. Those errors had to be fixed, which resulted in unplanned work that caused delays and increased expense to the project.  Reed Depo., at pp. 61:9-62:6, 38:6-39:1; Saad Depo., at pp.110:12-111:9, 190:15-20.

16.     Chris Reed initially gave Saad the benefit of the doubt, and coached him throughout 2016 to help him improve his work quality. Reed Decl. at ¶ 18. But as 2016 wore on, Saad's consistently poor design quality, lack of attention to detail, lack of urgency (and resulting missed deadlines), and numerous errors that had to be caught by his coworkers became too problematic for ASML. Reed Decl. at ¶ 18.

17.     At the end of 2016, Reed rated Saad's 2016 work quality as "below expectations," and gave him an overall year-end performance rating of "partially meets expectations" (the average of a "meets expectations" rating on how he contributed, and a "below expectations" rating on what he contributed). Exh. 2 to Reed Decl. at ASML-SAAD.00042. Reed included the following feedback in Saad's 2016 performance evaluation:

> 2016 cannot be considered a success for Mohamed. The year started rocky which can be partly attributed to the team development of the FCP. A concept was arrived upon, but the resulting quality can be attributed to the execution of the concept and as executor, responsibility of this result rests with Mohamed's performance.
> ***
> In line with other targets, high quality was not achieved, timeliness and documentation had issues, a presentation to the Group on Mohamed's ASML work did not happen. Performance cannot be considered meeting…expectations.
>
> ***
> Mohamed continues to have issues with sense of urgency and energy even after discussions on the topic. Being present physically and mentally are required for adequate performance.

Exh. 2 to Reed Decl. at ASML-SAAD.00040-42.

18.     For his part, Saad recognized there were areas in which he was struggling – he even rated himself "below the target" in one key area in his 2016 performance review – and he committed to work to improve his struggling performance. Reed Decl., at ¶ 11; Exh. 2 to Reed Decl. at ASML-SAAD.00039; Saad Depo., at pp. 200:25-203:22.

19.     Because he was rated "partially meets expectations" in his 2016 performance evaluation, ASML protocol required Saad to automatically be placed on a Performance

Improvement Plan ("PIP") in 2017 to help rehabilitate his poor job performance. Saad Depo., at pp. 181:3-8, 194:3-8; Reed Depo, at p. 93:18-23.

20. The fact that Saad would be required to successfully complete a PIP in 2017 to keep his job was predetermined as of the time his performance score was assigned at the end of 2016. Reed Decl. at ¶ 12.

21. Reed prepared Saad's PIP in the Spring of 2017, and delivered it to Saad on or about May 25, 2017. Reed Decl. at ¶ 13; Reed Depo., at p. 95:12-25.

22. The PIP identified three areas in which Saad needed to improve in order to keep his job: (1) attention to detail (eliminating errors and improving work quality); (2) being present (being engaged in his work; demonstrating a sense of urgency and energy needed to meet commitments); and (3) meeting commitments (committing to and meeting deliverable due dates so project delays would not result). Exh. 3 to Reed Decl. at pp. ASML-SAAD.00026-28. The PIP included numerous examples of all three performance problems to help Saad recognize where improvement was needed. *Id*.

23. Saad agrees that when he was placed on the PIP he needed to improve upon being present (attending meetings and sharing in meetings) and meeting commitments (hitting deadlines). Saad Depo., at pp. 200:25-203:22. Saad also agrees he had lost his focus at work, which delayed his work product. Saad Depo., at pp. 202:22-203:4.

24. ASML gave Saad 60 days to successfully complete his PIP. Exh. 3 to Reed Decl. at ASML-SAAD.00026; Saad Depo., at p. 205:12-25. To ensure Saad had more than enough time to demonstrate improvement, Reed only counted weekdays in calculating the 60-day deadline, which expired on or about August 15, 2017. Reed Decl. at ¶ 14.

25. Throughout the PIP, Reed met with Saad every week one-to-one to evaluate his progress, identify action items to help him improve, and to record feedback and task status in a working version of the PIP they updated each week together. Saad Depo., at p. 223:2-22; Reed Depo, p. 91:2-10; *see generally* Exhs. 4-6 to Reed Decl..

26. Reed also met regularly with Saad's Team Lead (Matthew Urmaza) and Architect David Taub (with whom Saad worked closely) to elicit feedback on Saad's job performance and his workload. Reed Decl. at ¶ 16; *see also* Exhs. 9 and 13 to Reed Decl..

27. Saad testified that the expectations of the PIP were clear to him, and he had all the tools and resources he needed to achieve success under the PIP. Saad Depo., at pp. 204:17-205:2.

28. Saad committed to improve his performance, and he even provided Reed with a written explanation of how he would improve his performance in the areas outlined in his PIP. Saad Depo., at pp. 219:3-220:18.

29. Saad agreed there was never any reason he could not be successful at ASML. Saad Depo., at p. 79:14-18. Saad also testified that he understood he could be fired if he did not demonstrate sufficient improvement under the PIP. Saad Depo., pp. 215:25-216:3.

30. At the time Saad was hired, he went through ASML new-hire orientation, which included training on ASML's Human Resources policies, including its leave of absence policy which provides employees notice of their FMLA rights. Saad Depo., at pp. 79:23-80:14; Declaration of Jennine Labriola, attached hereto as **Exhibit D** ("**Labriola Decl**.") at ¶ 6.

31. As an ASML employee, Saad had 24/7 access to ASML's HR policies through its secure intranet, so he was able to review his FMLA rights any time. Saad Depo., at pp. 81:17-82:2; Labriola Decl. at ¶ 7.

32. ASML's leave of absence policy explains all facets of FMLA eligibility and leave, including that FMLA leaves are unpaid (but paid leave may be used for family care and medical leaves), and FMLA must be requested in writing. Exh. 1 to Labriola Decl. at pp. ASML-SAAD.000202-203.

33. The policy also provides for up to six (6) months of non-FMLA medical leave to employees who have exhausted their FMLA or who are not yet eligible for FMLA leave. Exh. 1 to Labriola Decl. at p. ASML-SAAD.000201.

34. In 2016, Saad ran his paid leave balances (sick and vacation) into the negative while allegedly caring for his wife who he claimed had been in and out of hospitals undergoing medical treatments for Crohn's disease. *See* email chain concluding on October 24, 2016, attached hereto as **Exhibit E** (ASML-SAAD.001343) (authenticated at Saad Depo., at pp. 153:4-155:4, 166:6-11); *see also* Exh. 3 to Labriola Decl..

35. On October 17, 2016, more than two months before he became FMLA-eligible, Saad emailed Reed because he needed additional time off to care for his wife who required more medical treatment for her condition. Exh. E.

36. In response to Saad's email, Reed met with Saad in person on October 24, 2016 to discuss Saad's need for more time off. Reed Depo., at pp. 85:9-86:8.

37. Reed explained the FMLA benefits Saad would become eligible for in January 2017, and also encouraged Saad to talk to Human Resources ("HR") regarding other leave benefits that may be available to him before then. Exh. E; Reed Depo., at pp. 85:9-86:6.

38. That same day, Reed sent a follow-up email to Saad attaching the company's FMLA policy and encouraging Saad to contact HR:

> Mohamed, [a]s we discussed today FMLA is an avenue. The exact policy is here:
> https://my.asml.com/locations/us/uswide/US-HRO/Documents/Administrative%20Policies/103.pdf
> You need to have worked 12 months before taking advantage of it.
> For further details contact HR.

Exh. E.

39. Saad admits he did not contact HR or click on the link to view ASML's leave policy, but he acknowledges he could have done so if he wanted to. Saad Depo., at pp. 168:11-18, 170:15-171:16, 172:10-21.

40. The first time Saad claims he engaged in FMLA-protected activity was the third week of May 2017 when he allegedly notified ASML of his wife's high-risk pregnancy. Saad Depo., at pp. 123:22-126:25.

41. Notably, the serious health condition Saad argues entitled him to FMLA in 2017 (his wife's high-risk pregnancy) was *different* than the condition his wife had in 2016 (Crohn's Disease) which caused him to exhaust his paid leave, then inquire about other leave options. *Compare* Exh. E *with* Saad Depo, at p. 123:22-25.

42. Even then, however, Saad did not ask the company for any benefits under the FMLA. Saad Depo., at pp. 124:1-126:25.

43. According to Saad, he merely gave Reed "a heads-up" that his wife may call him in the middle of a meeting, and he would have to run back home to pick her up and take her to the hospital. Saad Depo., at pp. 124:1-126:25.

44. Saad never requested intermittent or reduced-schedule leave from ASML – rather, Saad only asked the company to bless his time off at the moment he took it, which the company always did. Saad Depo., at pp. 46:5-47:1; *see also* ¶¶ 53-54, *infra*. And he always notified ASML of his need for time off verbally – never in writing as ASML's policy requires. Saad Depo., at pp. 46:5-47:1.

45. In his lawsuit, Saad now claims that he needed intermittent FMLA leave ("a few days off at a time") in 2017. Saad Depo., at pp. 33:25-34:6.

46. Saad testified that he would only have needed FMLA leave if he had exhausted his paid vacation and sick time, which ASML's leave policy allowed him to use before taking unpaid FMLA leave. Saad Depo., at pp. 22:24-23:8; Labriola Decl. at ¶ 9; Exh. 1 to Labriola Decl. at ASML-SAAD.000202.

47. And indeed that is exactly what Saad did in 2016 when he ran his paid leave into a negative balance, then reached out to inquire about other leave options available to him. Exh. E; Exh. 3 to Labriola Decl..

48. According to Saad, as long as he had paid time off, he would have used it to care for his wife when needed; he would not have let it sit in the bank:

> Q. So if you had any sick or vacation time in the bank, you would have used that to care for your wife if she needed to be cared for; right?

7

>   A. Yes.
>
>   Q. You wouldn't just let –
>
>   MR. SABATINI: Object to form.
>
>   BY MR. NAYLOR:
>
>   Q. You wouldn't just let sick or vacation time sit in the bank for conservation purposes if your wife needed you to be home; right?
>
>   A. No.

Saad Depo., at p. 25:5-15; *see also* Saad Depo. At p. 216:4-216:22.

49.   Additionally, Saad had an economic incentive to use his paid time off before requesting unpaid FMLA because the longest his family could have survived without his income was just two weeks. Saad Depo., at p. 38:9-20.

50.   And Saad does not dispute that, after becoming FMLA eligible on January 4, 2017, he *always* had a net positive balance of paid leave which he could have used to care for his wife when necessary. *See generally* Exh. 2 to Labriola Decl.; Saad Depo, at p. 146:18-22.

51.   In fact, a review of Saad's paystubs reflects that Saad's net paid leave balance never dipped below 45.8 hours after he allegedly notified Reed of his wife's high-risk pregnancy in late May 2017. Labriola Decl. at ¶ 12; Exh. 3 to Labriola Decl..

52.   Saad's three final paychecks (Exh. 2 to Labriola Decl. at ASML-SAAD.001362-1364), which are all dated September 1, 2017, reflect negative sick and vacation balances because ASML paid Saad's accrued paid leave out at termination, but in fact <u>over</u>paid him 22.64 sick hours and 4.62 vacation hours beyond what he was owed, due to a payroll error. Labriola Decl. at ¶ 13; Saad Depo., at pp. 142:7-12, 144:4-12.

53.   Saad acknowledges that nobody at ASML ever told him he could not go home to care for his wife when he needed to, and nobody stopped him from doing so. Saad Depo., at pp. 101:13-102:4, 108:14-19.

54. Similarly, Saad testified that during the time he was FMLA eligible, if his wife's condition ever required him to leave work to be home with her, he always did so. Saad Depo., at p. 148:10-15.

55. ASML is aware of only one instance in 2017 where Saad requested time off work to care for his wife. Reed Decl. at ¶ 32; Reed Depo., at pp. 87:14-90:5. In that instance, Saad took August 21 to August 23, 2017 off work, and used his available sick pay to cover his absence. Exh. 2 to Labriola Decl. at p. ASML-SAAD.001362; Labriola Decl. at ¶ 15.

56. When Saad returned to work on August 24, 2017, he informed the company that his wife had been in the hospital. Reed Decl. at ¶ 32.

57. Additionally, at the time Saad returned to work on August 24, 2017 he had no plans to take any additional time off work. Saad Depo., at p. 265:7-11.

58. Saad admits he has no evidence that ASML interfered with his FMLA rights. Saad Depo., at pp. 38:23-39:3.

59. Although the expectations in his PIP were clear, and he had the tools and resources needed to successfully complete his PIP, Saad failed to successfully complete the requirements of his PIP. Saad Depo., at pp. 204:17-205:2, 195:10-14, 250:18-251:8; Exh. 7 to Reed Decl..

60. Saad admits he missed meetings during his PIP. Saad Depo., at p. 215:9-12.

61. Reed caught Saad sleeping during a team meeting and had to nudge him awake (Reed Depo., at pp. 123:24-124:7), Urmaza caught Saad snoring in his cubicle on July 19, 2017 and again on August 10, 2017 (Exh. 8 to Reed Decl.), and Saad himself admitted to sleeping on the job *four times* in June and July of 2017 (Saad Depo., at p. 243:19-23).

62. Despite his agreement that being present and engaged was an area in which he needed to improve, Saad failed to do so during his PIP. Saad Depo., at pp. 200:25-201:12; Reed Decl. at ¶ 21.

9

63. Meeting deadlines was part of his job, and Saad acknowledged that his failure to meet deadlines could delay the whole project and cost ASML a lot of money. Saad Depo., at pp. 110:9-111:9.

64. Reed mentored Saad on a weekly basis, helping him to develop a day-to-day plan for how he was going to get his work done by the commitment dates, but Saad's performance problems persisted and his pace of work was too slow. Reed Depo., at pp. 113:18-116:18.

65. As a result, Saad admits he turned in his work product late and "did not hit deadlines during the PIP." Saad Depo., at pp. 128:12-18, 215:9-12.

66. Despite his acknowledgement that meeting commitments was an area in which he needed to improve, Saad failed to do so during his PIP. Saad Depo., at pp. 200:25-201:12, 215:9-12.

67. Saad acknowledges that ASML had the right to expect him to do his work with precision, free of needless errors. Saad Depo., at pp. 197:18-198:3.

68. But those errors persisted after Saad was put on the PIP. Saad Depo., pp. 94:6-10, 197:1-25.

69. So, in early July 2017, Reed decided to clear everything else from Saad's plate so he could focus his time exclusively on designing the objective test fixture, which was his most important project. Exh. 9 to Reed Decl.; Reed Depo., at pp. 113:18-114:8; Saad Depo., at pp. 239:17-20, 89:1-25.

70. Reed did this so Saad could focus on one thing, without the distractions of other projects, and to ensure Saad had more than enough time to complete the objective test fixture on time and free of errors. Reed Depo., at pp. 108:11-22, 113:18-114:8; Exh. 9 to Reed Decl..

71. But even with this extra time, Saad's designs for the objective test fixture continued to suffer from defects and errors, which had to be caught by Saad's coworkers. Reed Depo., at pp. 114:17-115:19; *see generally* Exhs. 10-11 to Reed Decl..

72. Saad would take his coworkers' feedback on the defects and errors back to his desk, then claim he had fixed them and solved all of the issues, only to present the design again

with many of the same defects and often new defects that didn't exist in the prior version, thus creating extra work and causing delays in the project schedule. Reed Depo., at pp. 57:21-58:25, 114:17-116:18; *see generally* Exhs. 10-13 to Reed Decl..

73. On or about August 15, 2017, the day Saad's PIP expired, Reed opened up Saad's 3D CAD model to view his design (which at that late date should have been error-free), and immediately discovered errors, including a critical mechanical interference, which made the design un-manufacturable and unusable. Reed Depo., at pp. 44:15-45:19; Reed Decl. at ¶ 19.

74. The errors in Saad's design were so significant that the objective would not have mounted to the fixture – which was the entire purpose of the design. Reed Decl. at ¶ 20; ASML.184; Reed Decl).

75. David Taub marked up Saad's designs and sent them back to him in an email that explained the errors and circled them in Saad's design. Exh. 12 to Reed Decl. at ASML-SAAD.000184.

76. Saad acknowledged his primary error ("[s]omehow the angle shifted 5 degrees with the last update") and claimed he had fixed it. Exh. 12 to Reed Decl. at ASML-SAAD.000183.

77. But Taub, Urmaza and Reed found numerous other errors that made the design un-manufacturable and unusable. Exh. 12 to Reed Decl. at ASML-SAAD.000181; Reed Decl. at ¶ 19.

78. Because Saad's design still had numerous critical errors, despite Reed's coaching and extra time ASML had given Saad by clearing his plate, Reed concluded that Saad had failed to meet the "attention to detail" prong of his PIP – just like he failed to meet the "being present" and "meeting commitments" prongs as well. Reed Decl. at ¶ 21.

79. Accordingly, on or about August 15, 2017, Reed made the decision to terminate Saad's employment for performance reasons.; specifically, because he failed to meet the requirements of his PIP. Reed Decl. at ¶ 22

11

80. Saad acknowledges that his job performance did not improve, and actually got worse, while he was on the PIP. Saad Depo., at p. 195:10-14.

81. Saad agrees that Chris Reed determined he had failed his PIP. Saad Depo., at pp. 250:18-251:8.

82. Saad acknowledges that his poor performance is the reason ASML fired him. Saad Depo., at p. 257:16-19.

83. Saad even testified that in July 2017 he sensed he was failing the PIP and was at risk of losing his job, so he began applying for jobs at other companies. Saad Depo., at pp. 270:5-271:23.

84. Saad agrees that Reed made the decision to terminate his employment one or two weeks before his actual termination based, in part, on the misalignment identified in David Taub's August 15, 2017 email to Saad. Saad Depo., at pp. 94:6-95:1, 96:17-20, 251:24-252:14; *see generally* Exh. 8 to Reed Decl..

85. After Reed decided on or about August 15, 2017 to terminate Saad's employment based on his failed PIP, Reed set up a meeting with his boss Ken Bogursky, and HR representatives Cynthia Houston and Jennine Labriola, to discuss the logistics of the termination. Reed Decl. at ¶ 23.

86. They met on August 22, 2017 (the first date that was convenient for all participants), and it was decided that Reed and Houston would communicate the termination to Saad when he returned to work on August 24, 2017. Reed Decl. at ¶¶ 23-24.

87. On August 24, 2017, Reed and Houston informed Saad that he was being discharged for failing to meet the goals of his PIP. Reed Decl. at ¶ 25; Saad Depo., at p. 258:7-12; Compl. ¶ 11.

88. During his deposition, Saad narrowed his FMLA interference claim to the single allegation that "ASML interfered with [his] right under the FMLA by failing to inform [him] of the FMLA and the possibility that [he] could have benefits under the FMLA." Saad Depo., at p. 54:10-14.

89. According to Saad, if ASML had informed him of his FMLA rights on his first day of employment, he would have no claim against the company and would not have brought this lawsuit.  Saad Depo., at pp. 121:19-122:6, 29:9-22.

RESPECTFULLY SUBMITTED this 27th day of February, 2020.

By   /s/  Benjamin J. Naylor
Benjamin J. Naylor (ct30702)
**BurnsBarton PLC**
2201 E. Camelback Rd., Suite 360
Phoenix, AZ  85016
T: (602) 753-4500
F: (602) 428-7012
ben@burnsbarton.com
Attorney for Defendant

**CERTIFICATE OF SERVICE & NOTICE OF ELECTRONIC FILING**

I hereby certify that on the 27th day of February, 2020, I electronically transmitted the foregoing document to the Clerk's office using the ECF System for filing and transmittal of a Notice of Electronic filing to the following ECF registrant:

    James V. Sabatini, Esq.        (jsabatini@sabatinilaw.com)

/s/ *Carolyn Galbreath*
An employee of BURNSBARTON PLC